# EXHIBIT 1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*
**Electronically FILED**
by Superior Court of California, County of San Mateo
ON 9/21/2020
By /s/ Anthony Berini
Deputy Clerk

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Youtube, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Jane Doe, individually and on behalf of all others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Mateo County Superior Court
400 County Center, Redwood City, CA 94063

CASE NUMBER: *(Número del Caso):*
**20-CIV-04023**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Steven N. Williams, Joseph Saveri Law Firm, Inc., 601 California St. Suite 1000, San Francisco, CA 94108 - (415) 500-6800

DATE: *(Fecha)* 9/21/2020    Neal I. Taniguchi    Clerk, by *(Secretario)* /s/ Anthony Berini    , Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):*

under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date)*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Steven N. Williams (SBN: 175489)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000, San Francisco, CA 94108
  TELEPHONE NO.: (415) 500-6800      FAX NO. *(Optional):* (415) 395-9940
  ATTORNEY FOR *(Name):*

*FOR COURT USE ONLY*

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON
**9/21/2020**
By   **/s/ Anthony Berini**
Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN MATEO**
  STREET ADDRESS: 400 County Center
  MAILING ADDRESS: 400 County Center
  CITY AND ZIP CODE: Redwood City, CA 94063
  BRANCH NAME: Southern Branch:Hall of Justice and Records

CASE NAME:
JANE DOE V. YOUTUBE, INC.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | **20-CIV-04023**<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[x] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [x] Large number of witnesses
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [x] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify):*
5. This case [x] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: September 21, 2020

Steven N. Williams
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

1  Joseph R. Saveri (SBN 130064)
2  Steven N. Williams (SBN 175489)
   Kevin Rayhill (SBN 267496)
3  Kate Malone (SBN 290884)
   Kyle Quackenbush (SBN 322401)
4  **JOSEPH SAVERI LAW FIRM, INC.**
   601 California Street, Suite 1000
5  San Francisco, CA 94108
   Telephone: (415) 500-6800
6  Facsimile: (415) 395-9940
   jsaveri@saverilawfirm.com
7  swillliams@saverilawfirm.com
   krayhill@saverilawfirm.com
8  kmalone@saverilawfirm.com
   kquackenbush@saverilawfirm.com
9
   ***Attorneys for Plaintiff and the Proposed Class***
10

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON        9/21/2020
By    /s/ Anthony Berini
         Deputy Clerk

11
12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
13                          **COUNTY OF SAN MATEO**
14

| | |
|---|---|
| **JANE DOE,** individually and on behalf of all others similarly situated, | Civil Action No.   20-CIV-04023 |
| *Plaintiffs*, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| **YOUTUBE, INC.** | CLASS ACTION |
| *Defendant.* | |

21                              **NEED FOR ACTION**

22        1.      Plaintiff JANE DOE seeks to protect herself and all others similarly situated from the

23  dangers of psychological trauma resulting from exposure to graphic and objectionable content on

24  YouTube, Inc.'s platform and YouTube's failure to provide a safe workplace for the thousands of

25  contractors that scrub YouTube's platform of disturbing content.

26        2.      Every day, YouTube users upload millions of videos to its platform. Millions of these

27  uploads include graphic and objectionable content such as child sexual abuse, rape, torture, bestiality,

28  beheadings, suicide, and murder. To maintain a sanitized platform, maximize its already vast profits, and

cultivate its public image, YouTube relies on people like Plaintiff—known as "Content Moderators"—to view those videos and remove any that violate the corporation's terms of use.

3.     Working at YouTube's offices in California and offices of contract employers ("YouTube Vendors") across the country, Content Moderators—including Plaintiff—witnessed thousands of acts of extreme and graphic violence and sexual assault. From genocide in Myanmar to mass shootings in Las Vegas and Christ Church to videos of children being raped and animals being mutilated, Content Moderators spend hours a day making sure that disturbing content like this never appears to YouTube's users.

4.     Content Moderators also face repeated exposure to conspiracy theories, fringe beliefs, and political disinformation—from false information about participating in the census, to lies about a political candidate's citizenship status or eligibility for public office, to manipulated and/or doctored videos of elected officials, to denials that the Holocaust occurred, to suggestions that Covid-19 is a fraud. This type of content has destabilized society and often features objectionable content.

5.     As a result of unmitigated exposure to highly toxic and extremely disturbing images viewed using YouTube's proprietary "single review tool" ("SRT"), Plaintiff developed and suffers from significant psychological trauma including anxiety, depression and symptoms associated with PTSD.

6.     To cultivate its image, YouTube (through its parent company Google, LLC) helped draft workplace safety standards to attempt to mitigate the negative psychological effects that viewing graphic and objectionable content has on Content Moderators. These safety standards include obtaining a candidate's informed consent during the initial employment interview process; providing Content Moderators with robust and mandatory counseling and mental health support; altering the resolution, audio, size, and color of trauma-inducing images and videos; and training Content Moderators to recognize the physical and psychological symptoms of PTSD, anxiety, and depression.

7.     Although these safety standards could not eliminate the risk that Content Moderators would develop negative psychological disorders after viewing graphic and disturbing content, these standards could have reduced the risk and mitigated the harm.

8.     But YouTube failed to implement the workplace safety standards it helped create. Instead, the multibillion-dollar corporation affirmatively requires its Content Moderators to work under conditions it knows cause and exacerbate psychological trauma.

9.     By requiring its Content Moderators to review graphic and objectionable content, YouTube requires Content Moderators to engage in an abnormally dangerous activity. And by failing to implement the workplace safety standards it helped develop, YouTube violates California law. By imposing non-disclosure agreements, YouTube exacerbates the harm that it causes to Content Moderators.

10.    Without this Court's intervention, YouTube will continue to injure Content Moderators and breach the duties it owes to the Content Moderators who review content on its platform.

11.    On behalf of herself and all others similarly situated, Plaintiff brings this action (1) to compensate Content Moderators that were exposed to graphic and objectionable content on YouTube's platform, (2) to ensure that YouTube provides Content Moderators with tools, systems, and mandatory ongoing mental health support to mitigate the harm reviewing graphic and objectionable content can cause; and (3) to provide mental health screening and treatment to the thousands of current and former Content Moderators affected by YouTube's unlawful practices.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over all causes of action alleged in this Complaint pursuant to article VI, section 10 of the California Constitution and is a court of competent jurisdiction to grant the relief requested.

13.    This Court has personal jurisdiction over YouTube because it is headquartered in the County of San Mateo and regularly conducts substantial business there including at its office in San Bruno, California.

14.     Venue is proper in this Court pursuant to California Code of Civil Procedure sections 395 and 395.5. YouTube is headquartered in the County of San Mateo and conducts substantial business there. Plaintiff and the proposed class have been injured as a result of YouTube's illegal conduct in the County of San Mateo.

**PARTIES**

15.     Plaintiff JANE DOE is a resident of Travis County, Texas. From approximately January 16, 2018 until approximately August 24, 2019, Plaintiff worked as a Content Moderator, reviewing content for YouTube at an office located at 7700 West Parmer Lane, Austin Texas, 78717.  During this period, Plaintiff was employed by Collabera, Inc., ("Collabera"). Plaintiff has been diagnosed with depression and suffers from symptoms associated with anxiety and PTSD. Because of the trauma JANE DOE suffered, and the very real threat that publicity from this case could exacerbate JANE DOE's mental health problems, JANE DOE is using a pseudonym as provided for by California law.

16.     Defendant YouTube, Inc., is incorporated under the laws of Delaware with its headquarters located at 901 Cherry Avenue, San Bruno, California. YouTube is a fully owned subsidiary of Google, LLC.

**FACTUAL ALLEGATIONS**

**A. Content moderators watch and remove some of the most depraved images on the internet to protect YouTube's profits**

17.     In fiscal year 2019, YouTube and Google combined made approximately $150 billion in advertising revenue. In 2018, that number was nearly $127 billion, and in 2017 that number was almost $103 billion.

18.     YouTube is attractive to companies and individuals that want to buy ads because of its immense user base. YouTube has over a billion monthly active users. These users value YouTube for its plethora of content and ability to share information—from learning how to ride a bike, to viewing the daily news, to watching funny home videos.

19.     To generate this content, YouTube relies on users to upload videos to its platform. YouTube users upload 500 hours of video per minute, which works out to 30,000 hours per hour and 720,000 hours per day. As Johanna Wright—Vice President of Product Management at YouTube—describes it, YouTube is the "video library for the world."

20.     Instead of scrutinizing content before it is shared with its users, YouTube relies on users to report inappropriate content. YouTube receives millions of user reports of potentially objectionable content on its platforms.

21.     Depending on how the content is flagged, YouTube directs the content to various queues, including "Violent Extremism" ("VE"), "Adult," "Hate and Harassment," "Child Sexual Abuse Imagery" ("CSAI"), "Redshift," "Flagged," and "Sexual Activity and Nudity." Content Moderators then review the content to determine whether the content violates YouTube's Community Guidelines. According to YouTube, these Content Moderators are "essential…because human judgment is critical to making contextualized decisions on content."

22.     YouTube requires Content Moderators to review hundreds of thousands if not millions of potentially rule-breaking posts per week via YouTube's SRT. For example, between June and December of 2017, YouTube's Content Moderators reviewed nearly 2 million videos for violent extremist content alone.

23.     To tackle this immense amount of content, Susan Wojcicki—CEO of YouTube—pledged that YouTube would hire 10,000 Content Moderators in 2018. Plaintiff is informed and believes that there are thousands of Content Moderators that review YouTube's content in the United States.

**B. Repeated exposure to graphic imagery can cause devastating psychological trauma, including PTSD, Anxiety, and Depression**

24.     It is well known that exposure to images of graphic violence can cause debilitating injuries, including PTSD, anxiety, and depression.

25.     In a study conducted by the National Crime Squad in the United Kingdom, seventy-six percent of law enforcement officers surveyed reported feeling emotional distress in response to exposure to child abuse on the internet. The same study, which was co-sponsored by the United Kingdom's Association of Chief Police Officers, recommended that law enforcement agencies implement employee support programs to help officers manage the traumatic effects of exposure to child pornography.

26.     In a study of 600 employees of the Department of Justice's Internet Crimes Against Children task force, the U.S. Marshals Service found that a quarter of the cybercrime investigators surveyed displayed symptoms of psychological trauma, including secondary traumatic stress.

27.     Another study of cybercrime investigators from 2010 found that "greater exposure to disturbing media was related to higher levels of . . . secondary traumatic stress" and that "substantial percentages" of investigators exposed to disturbing media "reported poor psychological well-being."

28.     The Eyewitness Media Hub has also studied the effects of viewing videos of graphic violence, including suicide bombing, and found that "40 percent of survey respondents said that viewing distressing eyewitness media has had a negative impact on their personal lives."

29.     Whereas viewing or hearing about another person's traumatic event used to be considered "secondary traumatic stress," the current Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 5th ed. 2013) ("DSM-5") recognizes that secondary or indirect exposure to trauma, such as repeated or extreme exposure to aversive details of trauma through work-related media, meets the first diagnostic criterion for PTSD.

30.     While there is no way to eliminate the risk created by exposure to graphic and objectionable content, especially demanding job requirements or a lack of social support reduce resilience in the face of trauma exposure and increase the risk of developing debilitating psychological symptoms.

31.     Depending on many factors, individuals who have experienced psychological trauma may develop a range of subtle to significant physical and psychological symptoms, including extreme fatigue, dissociation, difficulty sleeping, excessive weight gain, anxiety, nausea, and other digestive issues.

32.     Trauma exposure and PTSD are also associated with increased risk of chronic health problems including cardiovascular conditions, pain syndromes, diabetes, and dementia.

33.     There is growing evidence that early identification and treatment of PTSD is important from a physical health perspective, as a number of meta-analyses have shown increased risk of cardiovascular, metabolic, and musculoskeletal disorders among patients with long-term PTSD.

34.     Psychological trauma and/or PTSD are also often associated with the onset or worsening of substance use disorders. Epidemiologic studies indicate that one-third to one-half of individuals with PTSD also have a substance use disorder. Compared to individuals without PTSD, those with PTSD have been shown to be more than twice as likely to meet the diagnostic criteria for alcohol abuse or

dependence; individuals with PTSD are also three to four times more likely to meet the diagnostic criteria for drug abuse or dependence.

35.     PTSD symptoms may manifest soon after the traumatic experiences, or they may manifest later, sometimes months or years after trauma exposure.

36.     An individual's risk of developing PTSD or associated symptoms may be reduced through prevention measures, categorized as primary, secondary, and tertiary interventions. Primary interventions are designed to increase resilience and lower the risk of future PTSD among the general population. Secondary interventions are designed to lower the risk of PTSD among individuals who have been exposed to trauma, even if they are not yet showing symptoms of traumatic stress. Finally, tertiary interventions are designed to prevent the worsening of symptoms and improve functioning in individuals who are already displaying symptoms of traumatic stress or who have been diagnosed with PTSD.

37.     Individuals who develop PTSD or other mental health conditions following traumatic exposure require not only preventative measures but also treatment. Unlike prevention, treatment measures are aimed at symptom resolution and recovery from the disorder.

38.     Preliminary screening is necessary to determine the types of prevention or treatment measures most appropriate for an individual.

**C. YouTube helped craft industry standards for mitigating the harm to Content Moderators**

39.     Founded in 2006, the Technology Coalition was created "to develop technology solutions to disrupt the ability to use the Internet to exploit children or distribute child pornography."

40.     Google (YouTube's parent company) was a member of the Technology Coalition at all times relevant to the allegations herein.

41.     In January 2015, the Technology Coalition published an "Employee Resilience Guidebook for Handling Child Sex Abuse Images" (the "Guidebook").

42.     According to the Guidebook, the technology industry "must support those employees who are the front line of this battle."

43.     The Guidebook recommends that internet companies implement a robust, formal "resilience" program to support Content Moderators' well-being and mitigate the effects of exposure to trauma-inducing imagery.

44.     With respect to hiring Content Moderators, the Guidebook recommends:

a.   In an informational interview, "[u]se industry terms like 'child sexual abuse imagery' and 'online child sexual exploitation' to describe subject matter";

b.   In an informational interview, "[e]ncourage candidate to go to websites [like the National Center for Missing and Exploited Children] to learn about the problem";

c.   In follow-up interviews, "[d]iscuss candidate's previous experience/knowledge with this type of content";

d.   In follow-up interviews, "[d]iscuss candidate's current level of comfort after learning more about the subject";

e.   In follow-up interviews, "[a]llow candidate to talk with employees who handle content about their experience, coping methods, etc."; and

f.   In follow-up interviews, "[b]e sure to discuss any voluntary and/or mandatory counseling programs that will be provided if candidate is hired."

45.     With respect to safety on the job, the Guidebook recommends:

a.   Limiting the amount of time an employee is exposed to child sexual abuse imagery;

b.   Teaching moderators how to assess their own reaction to the images;

c.   Performing a controlled content exposure during the first week of employment with a seasoned team member and providing follow up counseling sessions to the new employee;

d.   Providing mandatory group and individual counseling sessions administered by a professional with specialized training in trauma intervention; and

e.   Permitting moderators to "opt-out" from viewing child sexual abuse imagery.

46.    The Technology Coalition also recommends the following practices for minimizing exposure to graphic content:

    a.  Limiting time spent viewing disturbing media to "no more than four consecutive hours";

    b.  "Encouraging switching to other projects, which will allow professionals to get relief from viewing images and come back recharged and refreshed";

    c.  Using "industry-shared hashes to more easily detect and report [content] and in turn, limit employee exposure to these images. Hash technology allows for identification of exactly the same image previously seen and identified as objectionable";

    d.  Prohibiting Content Moderators from viewing child pornography one hour before the individuals leave work; and

    e.  Permitting Content Moderators to take time off as a response to trauma.

47.    According to the Technology Coalition, if a company contracts with a third-party vendor to perform duties that may bring vendor employees in contact with graphic content, the company should clearly outline procedures to limit unnecessary exposure and should perform an initial audit of the independent contractor's wellness procedures for its employees.

48.    The National Center for Missing and Exploited Children ("NCMEC") also promulgates guidelines for protecting Content Moderators from psychological trauma. For instance, NCMEC recommends changing the color or resolution of the image, superimposing a grid over the image, changing the direction of the image, blurring portions of the image, reducing the size of the image, and muting audio.

49.    Based on these industry standards, some internet companies take steps to minimize harm to Content Moderators. For instance, at Microsoft, "[t]he photos are blurred, rendered in black and white, and shown only in thumbnail sizes. Audio is removed from video." Filtering technology is used to distort images, and Content Moderators are provided with mandatory psychological counseling.

50.    At the UK's Internet Watch Foundation, each applicant for a content moderator position is assessed for suitability by a psychologist, who asks about their support network, childhood

9

experiences, and triggers. Applicants are then interviewed about their work skills before proceeding to a final interview where they are exposed to child sexual abuse imagery. Candidates sit with two current Content Moderators and review a sequence of images getting progressively worse, working towards the worst kinds of sexual violence against children. This stage is designed to see how candidates cope and let them decide whether they wish to continue with the application process. Once they accept the job, Content Moderators have an enhanced background check before they start their six months' training, which involves understanding criminal law, learning about the dark web, and, crucially, building relevant trauma resilience.

**D.  YouTube failed to implement the very standards it helped create**

51.     YouTube failed to implement workplace safety measures that it (through its parent company Google) designed in the Guidelines and that other companies and non-profits have implemented.

52.     During the hiring process, YouTube failed to properly inform prospective Content Moderators about the nature of the work or the effect reviewing graphic content can have on their mental health. Prospective Content Moderators are told they might be required to review graphic content, but they are not provided examples and they are not told that they would be required to review graphic content daily. They are also not asked about their experience with graphic content, they are not told that this content can have negative mental health impacts, they are not exposed to graphic content, they are not told to seek out other outside information, and they are not offered multiple days of interviews.

53.     Before Content Moderators are exposed to any graphic content or receive any training, they are required to sign an employment contract and Non-Disclosure Agreement ("NDA"). Only after these documents are signed does the training begin.

54.     During the training process, YouTube failed to train Content Moderators on how to assess their own reaction to the images, and YouTube failed to ease Content Moderators into review of graphic content through controlled exposure with a seasoned team member followed by counseling sessions.

55.     Instead, Content Moderators are provided a two-week training where an instructor presents PowerPoints created by YouTube. The PowerPoints covered various categories of content, including graphic violence, child abuse, dangerous organizations, solicitation, porn, animal abuse, regulated products, fraud, and spam. Each category was covered by 60–80 slides. For each category, the PowerPoint began with a brief description of the applicable Community Guidelines, and then dozens of examples of content, applying the Community Guidelines.

56.     This content was extremely graphic. For example, during training, Plaintiff witnessed a video of a smashed open skull with people eating from it; a woman who was kidnapped and beheaded by a cartel; a person's head being run over by a tank; bestiality; suicides; self-harm; children being rapped; births and abortions. As the example was being presented, Content Moderators were told that they could step out of the room. But Content Moderators were concerned that leaving the room would mean they might lose their job because at the end of the training new Content Moderators were required to pass a test applying the Community Guidelines to the content.

57.     During the three-week training, little to no time was spent on wellness and resiliency. Half-way through the training Plaintiff received—after Plaintiff was exposed to graphic content—two on-site Wellness Counselors spoke for an hour to the new Content Moderators. The Wellness Counselors told the Content Moderators where their offices were located, recommended that the Content Moderators get enough sleep and exercise, and reminded them that this job isn't for everyone. The Wellness Counselors also told the Content Moderators that they could take breaks if they saw graphic content. However, as described below, the quantity and quality quotas Content Moderators were required to meet meant that these promised breaks were illusory.

58.     YouTube also failed to provide safeguards known to mitigate the negative effects of reviewing graphic content.

59.     Content Moderators are required to review hundreds of graphic and disturbing videos each week. To determine whether a video should be removed, YouTube created and continually revises hundreds of rules that Content Moderators must use to determine whether flagged content violates YouTube's policies.

60.     Despite these complex Community Guidelines, YouTube imposed strict quantity and accuracy quotas on Content Moderators. Content Moderators were required to review between 100 and 300 pieces of content per day with an error rate of two to five percent. Supervisors often reminded Content Moderators of their quantity and accuracy quotas, telling the Content Moderators that "the Client [YouTube] isn't happy with the amount of content that has been reviewed" and would tell Content Moderators how many posts they needed to review each day.

61.      To determine whether Content Moderators meet these metrics, YouTube audits Content Moderator's work. To complete this audit, YouTube used two levels of reviewers above the first-level Content Moderators. Second-level Content Moderators audit first-level Content Moderators and specialize in certain areas of content, such as hate speech, foreign languages, and terrorism. Second-level Content Moderators are employed by YouTube Vendors. Third-level Content Moderators are employed by YouTube and audit second-level Content Moderators. If Content Moderators failed to meet the quantity and accuracy quotas, supervisors threat them with performance improvement plans ("PIPs"), which could lead to termination.

62.     YouTube was aware or should have been aware that its strict standards created stress and that such stress contributed to and exacerbated Content Moderator's risk of developing psychological trauma.

63.     For many reasons—including low wages, short-term contracts, and the trauma associated with the work—many Content Moderators remain in the position for less than one year.

64.     Because of this high turnover and due to the immense amount of content that requires manual review, YouTube is chronically understaffed. To make up for this shortfall, Content Moderators are required to work long hours reviewing graphic content, despite YouTube's own best practices described in the Guidebook and its claim in 2018 that Content Moderators would be limited to reviewing four hours of graphic content per day. In fact, Content Moderators routinely spend more than four hours a day reviewing graphic content, and some Content Moderators are given overtime pay to reduce backlogged queues.

65.     To review this content, YouTube designed and created the SRT, which it requires all Content Moderators to use, regardless of whether the Content Moderators are employed directly by

YouTube or by a YouTube Vendor and regardless of whether the Content Moderators are working at a YouTube facility or a facility operated by a YouTube Vendor.

66.     YouTube monitors and is aware of the content of the videos the Content Moderators view, the number of videos the Content Moderators view per hour and per day, and the length of continuous content moderation sessions and breaks. YouTube controls how the videos are displayed (e.g., full screen versus thumbnails, blurred versus unblurred, etc.), how the accompanying audio is broadcast, and whether videos begin automatically upon completion of the prior video or whether the Content Moderator can catch his or her breath by controlling the start of the ensuing video.

67.     YouTube failed to implement tooling safeguards in the SRT that would mitigate some of the harm caused by reviewing graphic and disturbing content, including changing the color or resolution of the video, superimposing a grid over the video, changing the direction of the video, blurring portions of the video, reducing the size of the video, and muting audio, although it knew that doing so was necessary to mitigate the harm to Content Moderators that was certain to result.

68.     This failure is especially glaring considering the reasonably uncomplicated nature of many of the tooling changes. In 2017, a request was posted on Buganizer—YouTube's internal reporting system for technical assistance—to implement tooling changes such as blurring images and videos. A Content Moderator in California commented on the request asking that a warning label be added to images and videos flagged as ultra-graphic violence. A YouTube engineer responded that this tooling change would take approximately half a day to implement. Suzanne French—Head of Global Vendor Operations at YouTube—commented that this tooling change was not a high priority and refused to implement the change.

69.     When especially graphic content started being posted during and after the genocide in Myanmar, the Content Moderator again commented on the Buganizer request to see if YouTube would reconsider its decision. The Content Moderator's request was ignored, and he was reprimanded for raising the issue. As of 2019, no tooling changes had been implemented.

70.     YouTube also failed to provide psychological support to Content Moderators. YouTube purportedly offered Content Moderators "wellness" benefits, including a "Wellness Coach," a hotline, and a human resources department.

71.     However, these support services were insufficient. Wellness Coaches were unavailable to Content Moderators that worked the evening shifts: 3:00 p.m. to 12:00 a.m. and 10:00 p.m. to 7:00 a.m. And even those Content Moderators that had access to a Wellness Coach did not receive any on-site medical care because Wellness Coaches are not medical doctors and cannot diagnose or treat mental health disorders. Instead, Wellness Coaches would occasionally recommend that a Content Moderator see a licensed clinician but would not provide any information on how to find treatment.

72.     Wellness Coaches were also underqualified and undertrained, and consequently Content Moderators did not feel comfortable asking them for help. For example, in spring of 2018, Plaintiff met with a Wellness Coach to discuss upsetting videos she had witnessed that were particularly traumatic. The Wellness Coach recommended that Plaintiff take illegal drugs. The Wellness Coach did not provide any resiliency training or coping mechanisms (beyond self-medicating with an illegal substance).

73.     A few months after that, Plaintiff spoke with a fellow Content Moderator that had met with a different Wellness Coach. That Wellness Coach told Plaintiff's co-worker to "trust in God," advice that was unhelpful.

74.     Content Moderators also believed that communications with Wellness Coaches were not kept confidential and feared that anything that was said to a Wellness Coach would be reported to management. And when Content Moderators tried to discuss the effect viewing graphic content had on their mental health, employees within the human resource department told Content Moderators they could not help them.

75.     YouTube also demands that Google Vendors require their employees to sign sweeping Non-Disclosure Agreements ("NDAs"). YouTube further requires YouTube Vendors to provide YouTube-developed training to all Content Moderators that instructs the Content Moderators not to speak about the content or workplace conditions to anyone outside of their review team, including therapists, psychiatrists, or psychologists retained by Content Moderators. By prohibiting Content Moderators from discussing their work or seeking outside social support, YouTube impedes the development of resiliency and increases the risk that Content Moderators will develop psychological

14

COMPLAINT AND DEMAND FOR JURY TRIAL

trauma. Furthermore, by imposing NDAs in violation of California law, YouTube is estopped from asserting any statute of limitations defense to these claims.

**E.   YouTube knows that exposure to graphic content can cause psychological trauma but seeks to silence whistle blowers and shield itself from liability**

76.     In 2019, YouTube acknowledged that viewing graphic content could lead to psychological trauma. Well before that, YouTube engaged in an aggressive campaign to hide evidence and silence whistle blowers. In 2017, Content Moderators were told to stop talking or posting about the negative effects of reviewing graphic content. YouTube also purged its messaging systems of any of these reports, deleting old posts by Content Moderators that shed light on the trauma they were experiencing.

77.     YouTube also sought to shield itself from liability. On December 20, 2019—four days after *The Verge* published an investigation into PTSD among workers at YouTube's Content Moderator facility in Austin, Texas—YouTube responded by requiring its Content Moderators to sign a document acknowledging that performing the job can cause PTSD.

78.     YouTube also required Content Moderators to acknowledge that "no job is worth sacrificing my mental or emotional health" and that "this job is not for everyone"—language likely drafted by lawyers and which is intended to suggest Content Moderators suffering from negative psychological health effects caused by exposure to graphic content might be terminated if they reported any negative impacts to their psychological health.

79.     If a Content Moderator is fired or quits, they lose medical insurance and other healthcare benefits, as well as their income. Therefore, Content Moderators were left with a Hobbesian's choice—quit and lose access to an income and medical insurance or continue to suffer in silence to keep their job.

80.     From approximately January 16, 2018 until August 24, 2019, JANE DOE worked as a "Content Review Analysist" (i.e., Content Moderator), reviewing content for YouTube at an office located at 7700 West Parmer Lane, Austin Texas, 78717.

81.     During this period, Plaintiff was employed solely by Collabera.

82.     At all times relevant to this complaint, Collabera was a YouTube Vendor.

83.     Collabera directly oversaw all human resources matters concerning Plaintiff.

84.     Plaintiff has never been employed by YouTube in any capacity.

85.     Plaintiff never received any wages from YouTube.

86.     Plaintiff never received YouTube's employee benefits package (e.g., wellness benefits, paid time off, and parental financial assistance).

87.     Plaintiff worked as a first-level Content Moderator.

88.     During her employment as a Content Moderator, Plaintiff was exposed to thousands of graphic and objectionable videos, including graphic violence, sexual assault, and child pornography. For example, Plaintiff witnessed a video of: a smashed open skull with people eating from it; a woman who was kidnapped and beheaded by a cartel; a person's head being run over by a tank; a man eating the head off a rat; a fox being skinned alive; a man falling to his death off a roof that included audio of the impact of his body hitting the ground; school shootings included dead bodies of children; a politician shooting himself; backyard abortions; child abuse; and child sexual assault.

89.     As a result of training for and providing content moderation services through YouTube's SRT and in accordance with YouTube's policies, Plaintiff developed severe psychological trauma including depression and symptoms associated with anxiety and PTSD.

90.     PTSD and related syndromes caused by exposure to harmful content can be triggered by witnessing abuse; watching the news or seeing violence on television; hearing loud noises like gunshots, fireworks, cars backfiring, or objects falling; seeing ISIS members or paraphernalia; and seeing racially-discordant posts sowing political dissension in America. She has trouble sleeping and when she does sleep, she has horrific nightmares. She often lays awake at night trying to go to sleep, replaying videos that she has seen in her mind. She cannot be in crowded places, including concerts and events, because she fears mass shootings. She has severe and debilitating panic attacks. She has lost many friends because of her anxiety around people. She has trouble interacting and being around kids and is now scared to have children.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this class action individually and on behalf of all persons who performed content moderation work for YouTube in the United States at any time up until the present.

COMPLAINT AND DEMAND FOR JURY TRIAL

92.     Excluded from this definition are Defendant's officers, directors, and management, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any Content Moderators that are employed directly by Defendant.

93.     The class is so numerous that joinder of all members is impracticable. Plaintiff does not know the exact size of the class since that information is within the control of YouTube and its Vendors. However, upon information and belief, Plaintiff alleges that the number of class members is in the thousands. Membership in the class is readily ascertainable from YouTube's records such as those relating to its contracts with YouTube's Vendors or to registered users of YouTube's SRT.

94.     There are numerous questions of law or fact common to the class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include the following:

      a.   Whether YouTube committed the violations of the law alleged herein;

      b.   Whether viewing graphic and objectionable conduct in the manner which Content Moderators do for YouTube is an abnormally dangerous activity;

      c.   Whether YouTube participated in and perpetrated the tortious conduct complained of herein;

      d.   Whether Plaintiff and the class are entitled to medical screening, treatment, and damages;

      e.   Whether YouTube should be ordered to implement and comply with industry guidelines for safety in content moderation.

95.     The claims asserted by Plaintiff are typical of the claims in that the representative plaintiff, like all class members, was exposed to highly toxic, unsafe, and injurious content while providing content moderation services for YouTube. Each member of the proposed class has been similarly injured by YouTube's misconduct.

96.     Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained attorneys experienced in class actions, complex litigation, California law, and issues involving content

moderation. Plaintiff intends to vigorously prosecute this litigation. Neither Plaintiff nor their counsel have interests that conflict with the interests of the other class members.

97.     Plaintiff and the class members have all suffered and will continue to suffer harm resulting from YouTube's wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many members of the proposed class who could not individually afford to litigate a claim such as is asserted in this complaint. This action likely presents no difficulties in management that would preclude maintenance as a class action.

## FIRST CAUSE OF ACTION
### NEGLIGENCE
**(Abnormally Dangerous Activity)**

98.     Plaintiff realleges and incorporates by reference herein all allegations above.

99.     A company is strictly liable to individuals that are injured while the company engages in an abnormally dangerous activity.

100.    An activity is abnormally dangerous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage.

101.    Requiring Content Moderators to review graphic and objectionable content is an abnormally dangerous activity. Content Moderators risk serious and debilitating psychological trauma, including severe anxiety, depression and PTSD and there is no way to eliminate this risk. Content moderation is also not a matter of common usage. Only a handful of technology companies, non-profits, government agencies, and non-governmental organizations review content.

102.    Strict liability for a defendant that engages in abnormally dangerous activity represents a social-policy determination that the defendant, while engaged in an enterprise tolerated by the law, must pay for the damage caused by its enterprise.

103.     In fiscal year 2019, YouTube and its parent company Google made a combined approximately $150 billion in advertising revenue. In 2018, that number was nearly $127 billion, and in 2017 that number was almost $103 billion. YouTube and Google are some of the most successful companies in history based on revenue.

104.     YouTube derives this vast wealth from providing a platform safe from graphic and objectionable content. YouTube relies on Content Moderators to ensure that its platform is free from graphic and objectionable content. Therefore, YouTube is required under the law to pay for the harm caused by requiring Content Moderators to review and remove graphic and objectionable content.

105.     As a result of YouTube's tortious conduct, Plaintiff and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

106.     To remedy that injury, Plaintiff and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

107.     The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

108.     In particular, the medical monitoring regime includes (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

109.     Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiff and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiff and the class have incurred as a result of YouTube's unlawful conduct.

110.    Plaintiff seeks medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

111.    Plaintiff also seeks compensatory damages for the injuries she and the class have suffered.

112.    Plaintiff also seeks an award of attorney's fees.

## SECOND CAUSE OF ACTION
### NEGLIGENCE
### (Negligent Exercise of Retained Control)

113.    Plaintiff realleges and incorporates by reference herein all allegations above.

114.    Solely in the alternative and to the extent it is determined that YouTube is not strictly liable for the harm caused by engaging in an abnormally dangerous activity, Plaintiff brings this second cause of action for negligence exercise of retained control.

115.    The hirer of an independent contractor is liable to an employee of the contractor insofar as the hirer's negligent exercise of retained control affirmatively contributed to the employee's injuries.

116.    If an entity hires an independent contractor to complete work but retains control over any part of the work, the hiring entity has a duty to the independent contractor's employees or subcontractors to exercise that control with reasonable care.

117.    If the hiring entity negligently exercises its retained control in a manner that affirmatively contributes to the injuries of the contractor's employees or subcontractors, the hiring entity is liable for those injuries.

118.    At all times relevant to the allegations herein, Plaintiff and class members were employees or subcontractors of independent contractors that YouTube hired to provide content moderation services including, for example, Collabera, Vaco and Accenture.

119.    YouTube exercised retained control over certain aspects of the work performed by Plaintiff and the class, including:

a. Requiring Content Moderators to use a YouTube-developed review platform that presented unmitigated traumatic content to Content Moderators according to YouTube-developed algorithms;

b. Requiring that Content Moderators—through their employers—sign NDAs and undergo YouTube-developed confidentiality trainings that prohibited Content Moderators from discussing their work outside their review teams;

c. Requiring that Content Moderators be interviewed and undergo training using YouTube-developed training materials and procedures; and

d. Setting expectations as to the overall timeframe for and accuracy of content review, calculating the amount of time it should take a Content Moderator to review different types of posts, and deciding the overall number of hours required to meet the overarching timeframe and accuracy expectations.

120. Based on its exercise of retained control, YouTube has had at all relevant times a duty to exercise reasonable care with regard to the safety of Plaintiff and the class.

121. YouTube negligently exercised its retained control in a manner that affirmatively contributed to the injuries of Plaintiff and the class, including by exacerbating Plaintiff's and class members' risks of developing PTSD or other health issues. For example:

a. YouTube failed to provide adequate technological safeguards to protect Content Moderators from risks associated with exposure to traumatic content via YouTube's SRT;

b. YouTube's NDAs and confidentiality requirements diminished Content Moderators' social support networks and resilience by prohibiting Content Moderators from speaking about the content they reviewed or other related workplace conditions to anyone outside of their review teams;

c. YouTube failed to provide Content Moderators with an interview process and training that met the standards it developed through the Technology Coalition's Guidebook; and

COMPLAINT AND DEMAND FOR JURY TRIAL

d.   By setting demanding standards for review, both in terms of quantity and quality expectations, YouTube imposed stressful work conditions that served to further reduce Content Moderators' resilience to trauma.

122.   YouTube was aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through the SRT.

123.   YouTube was also aware or should have been aware that the SRT could be made safer if proper precautions were followed, that requiring Content Moderators not to discuss their work or workplace conditions reduced their ability to deal with traumatic content, and that YouTube's overall quality and quantity standards had the effect of imposing intense workplace stress and, accordingly, increasing Content Moderators' risk of injury from psychological trauma.

124.   YouTube breached its duty to Plaintiff and the class by failing to provide the necessary and adequate technological safeguards, safety and instructional materials, warnings, social support, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through YouTube's SRT.

125.   YouTube continues to breach its duty to class members by failing to exercise its retained control with reasonable care; that breach continues to elevate class members' risk of injury from psychological trauma.

126.   As a result of YouTube's tortious conduct, Plaintiff and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

127.   To remedy that injury, Plaintiff and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

128.   The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

129.     In particular, the medical monitoring regime includes (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

130.     Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiffs and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiff and the class has incurred as a result of YouTube's unlawful conduct.

131.     Plaintiff seeks medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

132.     Plaintiff also seeks compensatory damages for the injuries she and the class have suffered.

133.     Plaintiff also seeks an award of attorney's fees.

### THIRD CAUSE OF ACTION
### NEGLIGENCE
### (Negligent Provision of Unsafe Equipment)

134.     Plaintiff realleges and incorporate by reference herein all allegations above.

135.     Solely in the alternative and to the extent that this Court concludes that YouTube is not strictly liable for the harm caused by engaging in an abnormally dangerous activity, Plaintiff brings this third cause of action for negligence provision of unsafe equipment.

136.     An entity that hires an independent contractor to complete work is liable to the independent contractor's employees or subcontractors if the hiring entity negligently provides unsafe equipment that contributes to a workplace injury.

137.     YouTube provided to its independent contractors the review platform that Plaintiff and the class were required to use to complete their work.

138.     YouTube had a duty to exercise reasonable care to furnish a safe review platform to its contractors.

139.     YouTube was aware of the psychological trauma that could be caused by viewing graphic and objectionable content, including videos and/or images of child abuse, rape, torture, bestiality, beheadings, suicide, murder, and other forms of extreme violence through its review platforms.

140.     YouTube was aware or should have been aware that its review platforms could be made safer if proper precautions were followed.

141.     YouTube nevertheless provided unsafe review tools to Plaintiff and the class that exposed Plaintiff and the class to unmitigated traumatic content.

142.     YouTube breached its duty to Plaintiff and the class by failing to provide necessary and adequate technological safeguards, safety and instructional materials, warnings, and other means to reduce and/or minimize the physical and psychiatric risks associated with exposure to graphic imagery through YouTube's review platform.

143.     YouTube continues to breach its duty to class members by failing to provide a reasonably safe review platform; that breach continues to elevate class members' risk of injury from psychological trauma.

144.     As a result of YouTube's tortious conduct, Plaintiff and the class are at an increased risk of developing serious mental health injuries, including, but not limited to, PTSD, anxiety, and depression.

145.     To remedy that injury, Plaintiff and the class need medical monitoring that provides specialized screening, assessment, and treatment not generally given to the public at large.

146.     The medical monitoring regime includes, but is not limited to, baseline screening, assessments, and examinations that will assist in diagnosing the adverse health effects associated with exposure to trauma. This screening and assessment will also inform which behavioral and/or pharmaceutical interventions are best suited to preventing or mitigating various adverse consequences of post-traumatic stress and other conditions associated with exposure to graphic imagery.

147.     In particular, the medical monitoring regime includes (a) secondary preventative interventions, designed to reduce the risk of later onset of PTSD among class members who are not yet

displaying symptoms of PTSD; (b) tertiary interventions, designed to reduce the worsening of symptoms among those who are already experiencing symptoms associated with post-traumatic stress or have a diagnosis of PTSD; and (c) evidence-based treatments to facilitate recovery from mental health conditions.

148.    Monitoring, assessing, and providing preventative interventions and/or treatment to Plaintiff and the class will significantly reduce the risk of long-term injury, disease, and economic loss that Plaintiff and the class have incurred as a result of YouTube's unlawful conduct.

149.    Plaintiff seeks medical screening and treatment to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including to prevent or mitigate conditions such as PTSD, anxiety, and depression.

150.    Plaintiff also seeks compensatory damages for the injuries she and the class have suffered.

151.    Plaintiff also seeks an award of attorney's fees.

**FOURTH CAUSE OF ACTION**
**CALIFORNIA UNFAIR COMPETITION LAW**

152.    Plaintiff realleges and incorporates by reference herein all allegations above.

153.    Solely in the alternative and to the extent that this Court concludes that YouTube is not strictly liable for the harm caused by engaging in an abnormally dangerous activity, Plaintiff brings this fourth cause of action for violation of California Unfair Competition Law.

154.    YouTube's negligent exercise of retained control of the content moderation work performed by Plaintiff and the class violates California common law.

155.    YouTube's negligent provision of unsafe equipment to its independent contractors for use by Plaintiff and the class also violates California common law.

156.    Plaintiff each suffered an injury in fact because of YouTube's negligent conduct and has lost money because of YouTube's conduct.

157.    Specifically, Plaintiff paid out of pocket for medical treatment and therapy for her depression and symptoms of anxiety and PTSD, which was caused by YouTube's conduct.

158.     There were and are reasonably available alternatives to the conduct described herein that would further YouTube's legitimate business interests.

159.     Plaintiff seeks all appropriate injunctive relief pursuant to section 17203 of the California Business and Professions Code, including an order requiring YouTube to implement safety guidelines for all prospective content moderation operations.

160.     Plaintiff also seek an injunction creating a YouTube-funded medical monitoring program to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including preventing or mitigating conditions such as PTSD, anxiety, and depression. The program should include a fund to pay for the medical monitoring and treatment of Plaintiff and the class as frequently and appropriately as necessary.

161.     Plaintiff also seeks an award of attorney's fees.

## FIFTH CAUSE OF ACTION
### CALIFORNIA UNFAIR COMPETITION LAW
#### (as "Special Employer")

162.     Plaintiff realleges and incorporate by reference herein all allegations above.

163.     Solely in the alternative and to the extent that this Court concludes that YouTube is a "special employer" of Plaintiff and the class, Plaintiff brings this fifth cause of action under the UCL based on YouTube's failure to provide a safe workplace and its violation of California's prohibition on non-disclosure requirements concerning workplace conditions.

164.     Section 6400 of California's Labor Code requires employers to "furnish employment and a place of employment that is safe and healthful for the employees therein." Similarly, section 6401 requires every employer to "furnish and use safety devices and safeguards, and [to] adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe and healthful."

165.     To protect employees from unsafe workplaces, California law requires that "[e]very employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees." Cal. Labor Code § 6401. This includes "establish[ing], implement[ing], and maintain[ing] an effective injury prevention program." Cal. Labor Code § 6401.7. Employers must "provide and use

safety devices and safeguards reasonably adequate to render the employment and place of employment safe," "adopt and use methods and processes reasonably adequate to render the employment and place of employment safe," and "do every other thing reasonably necessary to protect the life, safety, and health of employees." Cal. Labor Code § 6403

166.    No employer can "require or permit any employee to go or be in any employment or place of employment which is not safe and healthful." Cal. Labor Code § 6402.

167.    YouTube failed to provide a safe working environment. YouTube routinely and repeatedly exposed Plaintiff and the class to content known to cause psychological trauma, including PTSD, anxiety, and depression. Even though YouTube knew of and could have reasonably implemented adequate safety measures, the corporation refused to implement necessary and adequate safety and instructional materials, trainings, warnings, and means to reduce and/or minimize the risks associated with exposure to graphic content.

168.    YouTube's failure to provide a safe workplace for Plaintiff and the class violates, *inter alia*, sections 6400, 6401, 6401.7, 6402, and 6403 of the California Labor Code.

169.    In requiring Content Moderators to sign sweeping NDAs and instructing Content Moderators not to disclose information about working conditions—including the traumatic nature of the content, the intense stress from quantity and quality expectations, and the lack of training and safety measures to protect moderators from trauma exposure—YouTube further violates section 232.5 of the California Labor Code.

170.    YouTube's illegal conduct was and is willful and serious and has directly caused harm to Plaintiff and the class.

171.    Plaintiff suffered an injury in fact because of YouTube's conduct and has lost money because of YouTube's conduct.

172.    Specifically, Plaintiff paid out of pocket for medical treatment and therapy for her depression and symptoms of anxiety and PTSD, which was caused by YouTube's conduct.

173.    There were reasonably available alternatives to the conduct described herein that would further YouTube's legitimate business interests.

174.     YouTube's failure to follow worker safety laws amounts to an unlawful, unfair, and fraudulent business practice under California Business and Professions Code section 17200.

175.     Plaintiff seeks all appropriate injunctive relief pursuant to Business and Professions Code section 17203, including an order requiring YouTube to implement safety guidelines for all Content Moderators.

176.     Plaintiff also seeks an injunction creating a YouTube-funded medical monitoring program to facilitate the screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma, including preventing or mitigating conditions such as PTSD, anxiety, and depression. The program should include a fund to pay for the medical monitoring and treatment of Plaintiff and the class as frequently and appropriately as necessary.

177.     Plaintiff and the class will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

178.     Plaintiff also seeks an award of attorney's fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the class, requests that the Court:

a.   Certify this action as a class action with a class as defined above;

b.   Find that Plaintiff is a proper representative of the class and appoint the undersigned as class counsel;

c.   Order Defendant to pay to notify class members of the pendency of this suit;

d.   Order Defendant to create a medical monitoring fund for the benefit of Plaintiff and the class;

e.   Order Defendant to pay compensatory damages to Plaintiff and the class;

f.   Award injunctive relief as is necessary to protect the interests of Plaintiff and class members, including by enjoining Defendant from continuing to conduct business through the unlawful and unfair practices alleged herein, ordering Defendant to implement safety guidelines for all prospective content moderation operations, and ordering Defendant to establish a fund to pay for a medical monitoring program to facilitate the ongoing screening, diagnosis, and adequate treatment of Plaintiff and the class for psychological trauma—including to prevent

or mitigate conditions such as PTSD, anxiety and depression—until it can be determined that psychological trauma is no longer a threat to their health;

g. Award Plaintiff and class members their reasonable litigation expenses and attorneys' fees; and

h. Award any further relief that this Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby request trial by jury.

Dated:  September 21, 2020                    Respectfully Submitted,

JOSEPH SAVERI LAW FIRM, INC.

By:  _Sten Welle_

Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Kevin Rayhill (SBN 267496)
Kate Malone (SBN 290884)
Kyle Quackenbush (SBN 322401)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
swillliams@saverilawfirm.com
krayhill@saverilawfirm.com
kmalone@saverilawfirm.com
kquackenbush@saverilawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

COMPLAINT AND DEMAND FOR JURY TRIAL

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Steven Williams, 175489 <br> Joseph Saveri Law Firm, Inc. <br> 601 California Street, Suite 1000 <br> San Francisco, CA 94108 <br> TELEPHONE NO.: (415) 500-6800 <br> ATTORNEY FOR *(Name):* Plaintiff | **Electronically** <br> **FILED** <br> by Superior Court of California, County of San Mateo <br> ON   10/7/2020 <br> By _____ /s/ Una Finau <br> **Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

Superior Court of California, San Mateo County

400 County Center

Redwood City, CA 94063-1655

| PLAINTIFF/PETITIONER: Jane Doe, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Youtube, Inc. | 20-CIV-04023 |

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: <br> 1086.01 |
|---|---|

**BY FAX**

1. At the time of service I was a citizen of the United States, at least 18 years of age and not a party to this action.
2. I served copies of:

Summons, Civil Case Cover Sheet, Certificate Re Complex Case Designation, Blank Case Management Statement, Class Action Complex Notice of Assignment, Complaint, Case Management Order, Local Rule 2.3

3. a. Party served:  YouTube, Inc.

   b. Person Served: CSC - Susie Vang - Person Authorized to Accept Service of Process

4. Address where the party was served: 2710 Gateway Oaks Drive, 150N
   Sacramento, CA 95833
5. I served the party
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on (date): 09/25/2020          (2) at (time): 1:35PM
6. The "Notice to the Person Served" (on the summons) was completed as follows:


   d. on behalf of:

   YouTube, Inc.
   under: CCP 416.10 (corporation)
7. **Person who served papers**
   a. Name:       Tyler Anthony DiMaria
   b. Address:    One Legal - P-000618-Sonoma
                  1400 North McDowell Blvd, Ste 300
                  Petaluma, CA 94954

   c. Telephone number: 415-491-0606
   d. The fee for service was: $ 40.00
   e I am:
        (3)  registered California process server.
             (i)  Employee or independent contractor.
             (ii) Registration No.: 2006-06
             (iii) County:  Sacramento

8. I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Date:  09/26/2020



Tyler Anthony DiMaria

| (NAME OF PERSON WHO SERVED PAPERS) | (SIGNATURE) |
|---|---|

| Form Adopted for Mandatory Use <br> Judicial Council of California POS-010 <br> [Rev. Jan 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 <br> OL# 15241942 |
|---|---|---|

**FILED**
SAN MATEO COUNTY

SEP 2 3 2020

Clerk of the Superior Court
By _____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | Case No. 20CIV04023 CLASS ACTION |
| Plaintiffs, | Assigned for All Purposes to Hon. Marie S. Weiner, Dept. 2 |
| vs. | **CASE MANAGEMENT ORDER #1** |
| YOUTUBE, INC., | |
| Defendant. | |

Pursuant to the Notice of Assignment for All Purposes, Designation as Complex

Case, Setting of Case Management Conference, and Complex Fees due filed

September 21, 2020, designating this putative class action case as a complex action, and

single assigning to the Honorable Marie S. Weiner in Department 2 of this Court,

IT IS HEREBY ORDERED as follows:

1.      **Electronic Service.** Pursuant to Code of Civil Procedure Section

1010.6(c), and California Rules of Court, Rule 2.253(c) and Rule 2.251(c), all parties and

their counsel shall serve all documents electronically, and accept service of documents

1

electronically from all other parties, in conformity with Code of Civil Procedure Section 1010.6 and the California Rules of Court, except when personal service is required by statute.  Counsel for the parties shall meet and confer, agree upon, and keep updated, an e-service list for this complex civil action.  The parties are reminded that electronic service of documents may extend time periods for response by two (2) court days, pursuant to Code of Civil Procedure Section 1010.6(a)(4)(B).

2.      **Mandatory E-Filing.**  Pursuant to Code of Civil Procedure Section 1010.6(c), all parties shall file all documents electronically in this complex civil action, except those documents identified in Local Rule 2.1.8.  Presently, the following documents must still be filed/lodged in hardcopy paper:

Ex Parte Motions and Oppositions thereto

Stipulation and Proposed Order

Proposed Judgments

Abstract of Judgment

Appeal Documents, including Notice of Appeal

Administrative Records

The document (other than exhibits) must be text searchable.  Please visit www.sanmateocourt.org for further information on e-filing.  Please note that exhibits to any electronically filed briefs, declarations or other documents must be electronically "bookmarked" as required by CRC Rule 3.1110(f)(4).

3.      **Courtesy Copies for Department 2.**  A courtesy copy of all pleadings, motions, applications, briefs, and any and all other papers **filed** in this case **shall** be (1) electronically served upon Department 2 at email address complexcivil@sanmateocourt.org or (2) stamped "Judge's Copy" and *delivered by*

2

*overnight or first class mail directly to Department 2* located at Courtroom 2E, 400 County Center, Redwood City, California 94063. DO NOT LEAVE THE JUDGE'S COPY WITH THE CLERK'S OFFICE. PLEASE ADD DEPARTMENT 2 TO YOUR **E-SERVICE** SERVICE LIST IN THE CASE AS TO ANY AND ALL PAPERS FILED WITH THE COURT. All motions and briefs shall conform with the California Rules of Court, especially Rule 3.1113, and indicate on the caption page that this matter is assigned for all purposes to Department 2. Do not fax copies or correspondence to Department 2, as there is no dedicated fax line for the Complex Civil Department.

4.　**Obtain Hearing Date Pre-filing.** As to any and all motions or other matters requiring a hearing, the hearing date shall be obtained *directly* from and approved by Department 2 at **(650) 261-5102** (and *not* with the Civil Clerk's Office nor the Law & Motion Department) *prior* to filing of the moving papers or other initial filings.

5.　**Proposed Orders.** Proposed Orders should be e-filed with the motion or stipulation to which it relates in conformity with CRC Rule 3.1312(c). You must also email an editable version of the Proposed Order in Word format (not PDF) to complexcivil@sanmateocourt.org so that the judge can modify it prior to signing, if needed.

6.　**Electronic Correspondence to Department 2.** Correspondence to Department 2, such as discovery letter briefs, requests to take matters off calendar, and requests for rescheduling, regarding actions assigned to the Complex Civil Department shall be submitted electronically, rather than paper, by e-mail addressed to complexcivil@sanmateocourt.org All e-correspondence **must be sent in at least 12 point type.** This email address is for the Complex Civil Litigation Department to *receive* correspondence, and is not a venue for back-and-forth communications with the judge.

3

Communications to this email address are *not* part of the official court files – just like a paper letter, they are not "filed" documents – and will be retained for at least 30 days and then be subject to deletion (destruction) thereafter.

7. **Mandatory Email Header.** All communications to the complexcivil@sanmateocourt.org email address MUST include in the header "subject line" the **Case Number and Name of Case** (e.g., CIV 654321 *Smith v. Jones*).

8. **Ex Parte Motions.** Presently, due to the Covid 19 Pandemic, no in-person ex parte appearances are permitted – until further order of the court – and any ex parte appearances must be pre-schedule with Department 2 and pre-organized by the moving party for remote appearance by all involved parties and the Court. *Ex parte* applications in this matter shall heard by Department 2, **on Tuesdays and Thursday at 2:00 p.m.,** and the parties must meet the requirements of CRC Rule 3.120 *et seq.*. With the consent of counsel for *all* parties, telephone conferences on *simple* interim case management matters may be scheduled with the Court for a mutually convenient time and date – with the scheduling and logistics of such telephone conferences to be the responsibility of the requesting party/parties.

9. **E-Service of Discovery.** All discovery methods (C.C.P. § 2019.010), including but not limited to notice of deposition, special interrogatories, form interrogatories, requests for production of documents, and requests for admissions, shall be served electronically upon counsel for the parties. All discovery responses by a party in response to a discovery method by another party shall be served electronically upon counsel for the parties. Production of documents shall be provided in electronic form, unless the parties agree otherwise in writing. If not previously established, counsel for the parties shall meet and confer regarding possible establishment of a joint electronic

4

document depository for the uploading and downloading of electronic document productions.

10. **Informal Discovery Conferences.**

a. Pursuant to Code of Civil Procedure Section 2016.080, and the authority of a complex civil judge under CRC Rule 3.750, no party may move to compel discovery, or file any other discovery motion, until the parties have had an Informal Discovery Conference. Counsel must have exhausted all meet and confer obligations before the Informal Discovery Conference. To request an Informal Discovery Conference, counsel should contact the Court by email at ComplexCivil@sanmateocourt.org, which email must be contemporaneously copied to counsel for all parties to the action and any self-represented parties. Pursuant to Code of Civil Procedure Section 2016.080(c)(2), the time for bringing any motion to compel is tolled starting on the date a party makes the email request for an Informal Discovery Conference to the Court. All requests for Informal Discovery Conference must be made well prior to the expiration of the statutory time to bring a motion to compel or other discovery motion.

b. Within five (5) calendar days of the initial email request to the Court for an Informal Discovery Request, the disputing parties shall, jointly or separately, email correspondence to the Court at ComplexCivil@sanmateocourt.org, and contemporaneously to all parties, an electronic letter of no more than five (5) pages, without attachments, summarizing the discovery dispute(s).

c. The parties involved in the discovery dispute *shall **not*** file any "meet and confer" declarations pursuant to Code of Civil Procedure Sections 2016.040 or

2016.080(b) prior to the Informal Discovery Conference.  The dispute will be addressed by the e-correspondence method/procedure set forth above.

        d.      The procedures outlined above apply to parties.  With regard to discovery disputes with non-parties, the non-parties may elect to participate in this procedure, but are not required to do so.

11.     **No Discovery Motion Separate Statement.**  As to any discovery motions, the parties are relieved of the statutory obligation under CRC Rule 3.1345, and thus need *not* (should not) file a separate statement – instead the subject discovery requests (or deposition questions) and written responses (or deposition answers or objections) must be attached to the supporting declaration on the discovery motion.

12.     **Limit to 35.**  Given the nature of this complex civil action, the Court views document production and depositions as the most effective means of discovery for adjudication.  Accordingly, no party may propound more than 35 special interrogatories *total* and no party may propound more than 35 requests for admissions (other than as to the authenticity of documents) *total*, without prior court order after demonstration of need and a showing that other means of discovery would be less efficient.

13.     **No Appendix of Non-California Authorities.**  Pursuant to CRC Rule 3.1113(i), the Complex Civil Department, Dept. 2, does not require any appendix of non-California authorities, unless specifically stated by the Court as to a particular motion.

14.     **Case Management Conference.**  The initial Case Management Conference set for December 28, 2020 is VACATED.  The initial Case Management Conference is set for **Thursday, November 19, 2020 at 3:30 p.m.** in Department 2 of this Court, located at Courtroom 2E, 400 County Center, Redwood City, California.  Counsel for all parties shall meet and confer on all matters set forth in California Rules of

Court Rule 3.750 and Rule 3.724(8).  **All appearances shall be remote only, using CourtCall.**

15.     In anticipation of the Case Management Conference, counsel for the parties should be prepared to discuss at the hearing *and* file written case management conference statements (**in prose and details,** *not* **using the standardized Judicial Council form**) with a courtesy copy delivered *directly* to Department 2 on or before **November 12, 2020,** as to the following:

a.     Status of Pleadings and Service of Process;

b.     Status of Discovery, including the initial production of documents by all parties;

c.     Status of Settlement or Mediation;

d.     Conclusions reached after meet and confer on all matters set forth in CRC Rule 3.750 and Rule 3.724(8);

e.     Any anticipated motions and proposed briefing schedule;

f.     Setting of next CMC date; and

g.     Any other matters for which the parties seek Court ruling or scheduling.

16.     Discovery is not stayed.

17.     **PLAINTIFF SHALL PROMPTLY SERVE THIS CMC ORDER #1 UPON ALL DEFENDANTS OR UPON KNOWN COUNSEL FOR DEFENDANTS, and promptly file proof of service.**

DATED:      September 22, 2020

_____
HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

SERVICE LIST
*Doe v. YouTube,* Class Action No. 20CIV04023
As of September 2020

Attorneys for Plaintiffs:

JOSEPH SAVERI
STEVEN WILLIAMS
KEVIN RAYHILL
KATE MALONE
KLYE QUACKENBUSH
JOSEPH SAVERI LAW FIRM INC.
601 California Street, Suite 1000
San Francisco, CA  94108
(415) 500-6800
jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
krayhill@saverilawfirm.com
kmalone@saverilawfirm.com
kquackenbush@saverilawfirm.com

**FILED**

SAN MATEO COUNTY

SEP 2 3 2020

Clerk of the Superior Court

By _____

DEPUTY CLERK

### AFFIDAVIT OF MAILING

**CASE NUMBER: 20CIV4023**

**JANE DOE vs. YOUTUBE, INC.**

**DOCUMENT: CASE MANAGEMENT ORDER #1**

I declare, under penalty of perjury, that on the following date I deposited in the United State Post Office Mail Box at Redwood City, California a true copy of the foregoing document, enclosed in an envelope, with the proper and necessary postage prepaid thereon, and addressed to the following:

JOSEPH SAVERI
STEVEN WILLIAMS
KEVIN RAYHILL
KATE MALONE
KYLE QUACKENBUSH
JOSEPH SAVERI LAW FIRM INC.
601 California Street, Suite 1000
San Francisco, CA 94108

**Executed on: September 23, 2020**
**at Redwood City, California**

**NEIL TANIGUCHI**
**CLERK OF THE SUPERIOR COURT**

By: _____

Terri Maragoulas
**Deputy Clerk**

| Attorney or Party without Attorney (Name/Address) | FOR COURT USE ONLY |
|---|---|
| Steven N. Williams (SBN: 175489)<br>JOSEPH SAVERI LAW FIRM, INC.<br>601 California Street, Suite 1000, San Francisco, CA 94108<br><br>Telephone:  (415) 500-6800<br>State Bar No.:175489<br>Attorney for:  Plaintiff | **Electronically**<br>**FILED**<br>by Superior Court of California, County of San Mateo<br>ON ___9/21/2020___<br>By ___/s/ Anthony Berini___<br>Deputy Clerk |
| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN MATEO<br>400 COUNTY CENTER<br>REDWOOD CITY, CA  94063 | |

| Plaintiff |
|---|
|       Jane Doe |

| Defendant |
|---|
|          YouTube, Inc. |

| **Certificate Re Complex Case Designation** | Case Number<br>20-CIV-04023 |
|---|---|

## This certificate must be completed and filed with your Civil Case Cover Sheet if you have checked a Complex Case designation or Counter-Designation

1.      In the attached Civil Case Cover Sheet, this case is being designated or counter-designated as a complex case [or as not a complex case] because at least one or more of the following boxes has been checked:

☒ Box 1 – Case type that is best described as being [or not being] provisionally complex civil litigation (i.e., antitrust or trade regulation claims, construction defect claims involving many parties or structures, securities claims or investment losses involving many parties, environmental or toxic tort claims involving many parties, claims involving mass torts, or insurance coverage claims arising out of any of the foregoing claims).

☐ Box 2 – Complex [or not complex] due to factors requiring exceptional judicial management

☒ Box 5 – Is [or is not] a class action suit.

2.      This case is being so designated based upon the following supporting information [including, without limitation, a brief description of the following factors as they pertain to this particular case: (1) management of a large number of separately represented parties; (2) complexity of anticipated factual and/or legal issues; (3) numerous pretrial motions that will be time-consuming to resolve; (4) management of a large number of witnesses or a substantial amount of documentary evidence; (5) coordination with related actions

pending in one or more courts in other counties, states or countries or in a federal court; (6) whether or not certification of a putative class action will in fact be pursued; and (7) substantial post-judgment judicial supervision]:

This is a complex class action litigation involving thousands of putative class members,

numerous witnesses, substantial amount of documentary evidence, and anticipated

extensive motion practice.

_____

_____

_____

*(attach additional pages if necessary)*

3.  Based on the above-stated supporting information, there is a reasonable basis for the complex case designation or counter-designation [or noncomplex case counter-designation] being made in the attached Civil Case Cover Sheet.


**\*\*\*\*\***


I, the undersigned counsel or self-represented party, hereby certify that the above is true and correct and that I make this certification subject to the applicable provisions of California Code of Civil Procedure, Section 128.7 and/or California Rules of Professional Conduct, Rule 5-200 (B) and San Mateo County Superior Court Local Rules, Local Rule 2.30.


Dated:    09/21/2020


Steven N. Williams                                    *Steve Williams*
_____                  _____
[Type or Print Name]                              [Signature of Party or Attorney For Party]



**SUPERIOR COURT OF SAN MATEO COUNTY**
400 County Center, Redwood City, CA 94063
www.sanmateocourt.org

FOR COURT USE ONLY

# FILED
## SAN MATEO COUNTY
SEP 2 2 2020
Clerk of the Superior Court
By _____
DEPUTY CLERK

PLAINTIFF: **JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED**

DEFENDANT: **YOUTUBE, INC.**

**NOTICE OF ASSIGNMENT FOR ALL PURPOSES, DESIGNATION AS COMPLEX CASE, SETTING OF CASE MANAGEMENT CONFERENCE AND COMPLEX FEES DUE**

CASE NUMBER:
**20-CIV-04023**

This case has been filed by Plaintiff(s) as a putative class action.  By Standing Order 18-148 of the Presiding Judge, pursuant to California Rules of Court 3.400 and 3.403, this action is automatically deemed a "complex case" and assigned for all purposes to the Court's Complex Civil Litigation Judge, **the Honorable Marie S. Weiner, Department 2,** located at 400 County Center, Courtroom 2E, Redwood City, California 94063, (650) 261-5102.

The parties or their attorneys of record must appear for a Case Management Conference in Department 2 on **12/28/2020 at 9:00 a.m.**

**Pursuant to Government Code Section 70616(a), the complex case fee and the first appearance fee must be paid at the time of filing of the first paper in this complex case (Govt.C. 70616(b) and (d)).**

Plaintiff(s) pay a single complex case fee of $1,000 on behalf of all plaintiffs, whether filing separately or jointly.

Defendant(s) pay a complex case fee of $1,000 each on behalf of each defendant, intervenor, respondent, or adverse party, whether filing separately or jointly, at the time that party files its first paper in this case, not to exceed $18,000 total.

PLAINTIFF(S) IS/ARE REQUIRED TO SERVE A COPY OF THIS NOTICE ON ALL OTHER PARTIES TO THIS ACTION OR PROCEEDING, and promptly file proof of service.

Date: 9/22/2020                                   Neal I Taniguchi, Court Executive Officer/Clerk

### CLERK'S CERTIFICATE OF SERVICE

I hereby certify that I am the clerk of this Court, not a party to this cause; that I served a copy of this notice on the below date, by personally delivering a copy of this Notice to the Plaintiff or designee at 400 County Center, Redwood City, California.

Date: 9/22/2020                          By: _____
                                              Anthony Berini, Courtroom Clerk

**Mailing List:**

STEVEN N WILLIAMS
COTCHETT PITRE & MCCARTHY LLP
840 MALCOLM RD STE 200
BURLINGAME CA  94010